



## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

SAMEED NAVIWALA and AISHA
NAVIWALA, individually and on behalf of
Oxford Home Fashions, LLC,

    Plaintiffs,

  v.

SATISH KHANNA, NITIN KHANNA, and
NIDICO GROUP INC.,

    Defendants,

  and

OXFORD HOME FASHIONS, LLC,

    Nominal Defendant.

Civil Action No. **17    3234**

## COMPLAINT

Plaintiffs Sameed Naviwala and Aisha Naviwala, on their own behalves and derivatively

on behalf of Oxford Home Fashions, LLC, through their undersigned attorneys, bring this

Complaint against Defendants Satish Khanna, Nitin Khanna, and Nidico Group Inc., and in

support thereof aver as follows:

### NATURE OF THE ACTION

1.  This civil action arises from the contested wind-up of Oxford Home Fashions,

LLC, a venture in which Plaintiffs Sameed and Aisha Naviwala and Defendants Satish and Nitin

Khanna were all members.  Oxford Home Fashions, LLC operated from 2013 through 2016, and

was in the business of importing, distributing, and selling terry kitchen towels, terry bath towels,

and canvas arts and crafts items manufactured in Pakistan and China.  Before Oxford Home

Fashions, LLC was formed, the Naviwalas and the Khannas operated two different businesses and sold different product lines. The Naviwalas' business, Weave Hub, focused on terry kitchen towels, terry bath towels, and other cotton textiles and garments out of Pakistan. Weave Hub had a well-developed sourcing network in Pakistan of high-quality terry and cotton textiles. The Khannas operated a business by the name of Nidico Group Inc., which focused on placemats, runners, table tapestry, rugs, and non-terry woven towels based out of India and China. Nidico Group Inc. had in place front- and back-office infrastructure, as well as warehouse space. The Khannas agreed to allow Oxford Home Fashions, LLC to use this infrastructure in exchange for a greater share of Oxford Home Fashions, LLC's profits. Nidico Group Inc. charged a sizable fee for the infrastructure it provided. As a result, the Khannas, through Nidico Group Inc.'s infrastructure, controlled Oxford Home Fashions, LLC's books and bank accounts.

2.     As Oxford's business grew, and once the Khannas acquired the Naviwalas' and Weave Hub's institutional knowledge, the Khannas attempted to eliminate the Naviwalas from the business by demanding unreasonable increases in expense allocation and decreasing the agreed-upon fees payable to the Naviwalas. Beginning in 2015, and counter to the parties' agreements, the Khannas began demanding a larger share of the profits by increasing the fees for the infrastructure that Nidico Group Inc. provided to Oxford.

3.     By 2016, in the face of the Khannas' increasing demands, the relationship between the parties became increasingly acrimonious. Rather than continue the business in the face of the Khannas' mounting demands, the Naviwalas resolved to unwind and equitably distribute Oxford assets, and the Khannas agreed. According to that agreement, Oxford Home Fashions, LLC suspended operations in October 2016 except for orders that were already in production or unshipped and were scheduled to be shipped in November and December. The

parties also agreed that they would not charge their customary fees to the business for any orders going forward after October 31, 2016.

4.  After Oxford suspended its operations, however, the Khannas delayed and prevented the disbursement of the Naviwalas' assets for the purpose of preventing the Naviwalas and Weave Hub from competing with the Khannas and Nidico Group Inc. The Khannas' also began using Oxford Home Fashions, LLC's branding, including trademarks, logos, mottos and trade dress, for its own products in an effort to pass its goods off as those of Oxford. Khannas' strategy has proven successful, and the Khannas and Nidico Group Inc. are now unlawfully copying Oxford's entire product line.

5.  The assets of Oxford have not been distributed equitably. To the contrary, to date, the Khannas have unlawfully retained in excess of $750,000 in cash owed to the Naviwalas in connection with the wind up. That cash has been unlawfully transferred out of Oxford's bank accounts into accounts controlled solely by the Khannas. Furthermore, the Khannas and Nidico Group Inc. have also continued to use, in contravention of the Naviwalas' explicit instructions, Oxford's trademarks, logos, mottos, and trade dress, which are owned by Oxford, and should be subject to an equitable distribution along with the rest of Oxford's assets. Furthermore Nidico Group Inc.'s use of the trademarks, logos, mottos, and trade dress constitutes a violation of the Lanham Act.

6.  Through this lawsuit, the Naviwalas seek the appointment of a liquidating receiver to distribute the assets of Oxford Home Fashions, LLC, including trade dress and marks owned by Oxford Home Fashions, LLC, and currently unlawfully being used by Nidico Group Inc.

-3-

## THE PARTIES

7.      Plaintiff Sameed Naviwala is a natural person residing in Pennsylvania.  Plaintiff Aisha Naviwala is a natural person residing in Pennsylvania.  (Sameed Naviwala and Aisha Naviwala are collectively referred to as the "Naviwalas").

8.      Defendant Satish Khanna is a natural person residing in Pennsylvania.  Defendant Nitin Khanna is a natural person residing in Pennsylvania.  (Satish Khanna and Nitin Khanna are collectively referred to as the "Khannas").

9.      Plaintiff/Nominal Defendant Oxford Home Fashions, LLC ("Oxford") is a Pennsylvania limited liability company with its principal place of business at 775 American Drive, Bensalem, Pennsylvania.  Oxford is owned equally between the Naviwalas and the Khannas.

10.     Defendant Nidico Group Inc. ("Nidico") is a Pennsylvania corporation with its principal place of business at 775 American Drive, Bensalem, Pennsylvania.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over all Defendants in this action because they reside or are incorporated in this District.

12.     Venue is proper in this action because the unlawful conduct alleged in this action took place in this District, and this is the District in which all Defendants reside.

13.     This Court has subject matter jurisdiction over Plaintiffs' Lanham Act claims pursuant to 28 U.S.C. § 1338(a) and (b), which provide for original jurisdiction of the federal district courts in any civil action arising under any Act of Congress relating to trademarks, and in any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the trademark laws, as well as under 28 U.S.C. § 1331, which provides for original

-4-

jurisdiction of the federal district courts in any civil action arising under the Constitution, laws or treaties of the United States.

14.     This Court has subject matter jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367(a).

15.     The derivative claims in this action are brought in good faith and are not collusive to confer jurisdiction that the court would otherwise lack.

## FACTS

### Nidico Background

16.     Prior to the parties' joint venture Oxford, the Khannas operated Nidico, which is 100% owned by the Khannas. The Khannas continue to operate Nidico.

17.     Upon information and belief, Nidico has been in business since 1988.

18.     Nidico's main product lines include place mats, table tapestry, and woven non-terry kitchen towels imported from India and China.

19.     Nidico previously attempted to import goods from Pakistan to enhance their product line by adding terry kitchen towels and terry bath towels not easily available from India based on the quality, quantity and price required for Nidico's current target market.

### Weave Hub Background

20.     Prior to the parties' joint venture Oxford, the Naviwalas operated Weave Hub, which is 100% owned by the Naviwalas. The Naviwalas continue to operate Weave Hub.

21.     Weave Hub has been in business since 2009.

22.     Weave Hub's main product lines include terry kitchen towels, dish cloths, bar mop kitchen towels, terry bath towels, auto care products, and garments.

23. Weave Hub has established supply chains to reputable and reliable textile companies in Pakistan.

## Partnership Agreement

24. In or around August 2012, Anis Naviwala, Sameed Naviwala's father, and Satish Khanna met at the ASD Trade Show at the Las Vegas Convention Center in Las Vegas, Nevada. Both Weave Hub and Nidico had exhibits at the 2012 ASD Trade Show.

25. In 2012, Nidico decided to buy terry towels from Weave Hub because of Weave Hub's existing line of terry kitchen towels and bath towels, its textile background, good reputation in the market for importing terry towels, and existing business in Pakistan, and, in particular, its established supply chains to reputable and reliable textile companies.

26. After a few initial orders, Nidico realized that for it to succeed in this line of terry textiles, it needed to develop a strong partnership that had the knowledge and expertise in terry textiles from Pakistan. Additionally, Nidico recognized the business risk it would be undertaking to pursue the terry textile line. Thus, Nidico sought a partner that not only had the knowledge and expertise in terry textiles, but also had the funding to be able to make a loan to this new venture.

27. In early 2013, the Naviwalas and Satish Khanna held a meeting at Anis Naviwala's residence. The Naviwalas and the Khannas agreed that they would form a partnership—a new company—called Oxford Home Fashions, LLC.

28. The Naviwalas and the Khannas agreed that Weave Hub's contribution to Oxford would be the product range, expertise in the product procurement, and sourcing from Pakistan. The Naviwalas and the Khannas agreed that Nidico's contribution to Oxford would be to provide the infrastructure for this new joint venture.

-6-

29.     Additionally, the parties agreed that the Naviwalas would make an initial loan to Oxford in the amount of $300,000, to cover initial operating expenses.

30.     The parties agreed that Weave Hub would do the purchasing in Pakistan on behalf of Oxford and that Oxford would repay Weave Hub for the goods purchased.

## Development of Oxford Home Fashions, LLC

31.     The Naviwalas prepared a complete product range consisting of 30-50 items, with samples to present to the Khannas. These product lines became the basis of Oxford. At that time, Weave Hub was already producing, selling, and marketing these product lines. The Khannas asked the Naviwalas that Weave Hub discontinue its selling of these product lines to all customers and to halt all of Weave Hub's marketing efforts for these products for the benefit of Oxford.

32.     The parties agreed that in exchange for Weave Hub discontinuing its selling and marketing of these product lines and for offering its sourcing expertise, Oxford would pay Weave Hub 3% of the cost of goods for its sourcing services, which included development of product, identifying the appropriate vendors, price negotiations, order placement, managing production, quality control, and timely shipping ("3% Sourcing Fee"). Sourcing entails the manufacturing of the goods, conducting quality control, locating appropriate vendors, negotiating pricing, ensuring goods were shipped on time, sampling of goods, research, and developing products and designs. Additionally, the parties agreed that Weave Hub would be responsible for consolidation of shipment into containers, documentation for container shipping, developing Oxford's branding and creating the associated artwork for packing and advertising, catalog production, and sampling for trade shows.

33.     The Naviwalas were hesitant to halt all of Weave Hub's individual marketing efforts for these product lines.  However, the Naviwalas believed that the 3% Sourcing Fee was fair consideration for the expenses for product procurement and sourcing and the decreased sales Weave Hub would experience.

34.     The parties agreed that Oxford would use Nidico's existing office, warehouse, and marketing structure, and that Nidico would charge Oxford 4% of sales ("4% Infrastructure Fee").

35.     The parties further agreed that all of Oxford's profits would be split 50/50 between the Naviwalas and the Khannas.

36.     Additionally, the Naviwalas made the loan to Oxford in the amount of $300,000. Due to religious reasons, the Naviwalas did not charge any interest for its loan to Oxford. Rather, the Naviwalas determined that the 3% Sourcing Fee to Weave Hub and the 50% profit sharing agreement was fair in exchange for not charging interest on the $300,000 loan.  As the business grew, the Naviwalas loaned more money to Oxford based on the Khannas demands, which equaled $500,000 by the end of the partnership.

37.     If additional funds were needed, the Khannas agreed to loan money through their existing line of credit.

## Oxford Branding

38.     Oxford and Weave Hub expended significant resources branding its product lines. Generally, members of Oxford collaborated in the conception of the branding for the Oxford products, including trademarks, logos, and packaging (herein "branding"), and then turned over the branding concepts to Weave Hub for final development.  Weave Hub finalized  the branding

concepts and created the branding artwork that was used in the products' packaging. Examples of this artwork for years 2014, 2015 and 2016 are attached herewith as Exhibit A.

39.     Oxford owns and uses a number of trademarks and logos. Theses marks and logos include two principal marks, "SIMPLY HOME" and "KITCHEN ESSENTIALS," plus a number of minor marks, including, for example, "LILY & BLOOM," and the motto and logo "CLASSIC·FINE·PURE."

40.     The most common mark is SIMPLY HOME. The SIMPLY HOME logo comprises the SIMPLY HOME mark in all caps in BauerBodni BT font, with a fleur-de-lis emblem placed over it with horizontal lines on each side of the emblem as shown below:

## ⚜ SIMPLY HOME

Oxford has consistently used this trademark and logo on its products, including kitchen towels, hand towels, and bar mops. Customers have come to associate the high-quality towels sourced from Pakistan by Weave Hub with the Oxford brand of SIMPLY HOME.

41.     Oxford often associates the motto CLASSIC·FINE·PURE with products sold under its SIMPLY HOME mark. This motto is displayed as a logo comprises the words in all caps in BauerBodni BT font as shown below:

### CLASSIC · FINE · PURE

Typically, the motto logo is displayed below the SIMPLY HOME logo. Customers have come to associate the high-quality towels sourced from Pakistan by Weave Hub with the Oxford moto of CLASSIC·FINE·PURE.

42.     Oxford's second most popular mark is KITCHEN ESSENTIALS, which is used as an alternative mark in the same family of products to introduce diversity to the product

-9-

offering.  The KITCHEN ESSENTIALS logo comprises the KITCHEN ESSENTIALS mark in a lower case, sans serif font, with the words "kitchen" and "essentials," stacked and justified as shown below:

## kitchen
## essentials

Again, customers have come to associate the high-quality towels sourced from Pakistan by Weave Hub with the Oxford brand of KITCHEN ESSENTIALS.

43.    Oxford and Weave Hub worked together not only to finalize and develop the art work for Oxford's trademarks and logos,  but also to create  a distinctive trade dress theme for Oxford's product lines.  Exhibit A shows various design alternatives constituting Oxford suite of design options for its trade dress from 2014-2016.  Although there are a variety of options, Oxford's trade dress generally comprises a number of common attributes.  First, the placement of the trademark logo (e.g., SIMPLY HOME, KITCHEN ESSENTIALS) is at top center, and the motto, if used, is below the logo.  A description of the type of towel (e.g., "Kitchen Towel," "Bar Mop Kitchen Towel") is essentially centered in the label.  A description of the quantity of towels in the package (e.g., "set of two," "set of six") is placed under the description of the towel.  A description of the towel material (e.g., "100%  cotton") is at the bottom, left justified, and a description of the dimensions of the towel (e.g., "16 in x 19 in") is at the bottom, right justified. A border is used to frame the logos and other label contents.  The borders and background color/patterns can vary as indicated in Exhibit A.  On the back of the packaging, different versions of the care instructions are printed as shown below:

Wash separately before first use with like colors.
Dark colors bleed. Machine wash cold.
Use mild detergent. Tumble dry low.
Do not bleach. Do not iron.

RECOMMENDED CARE.
Machine wash with like colors.
Non-chlorine bleach. Tumble dry low.
For best results  wash before first use

44.     This trade dress is purely ornamental and has no functional purpose. Oxford has been using this trade dress consistently across its product line so that customers now associate the trade dress with Oxford products.

45.     The trademark, logo, and trade dress described above have become associated with Oxford products since at least 2014, and represent valuable assets of Oxford.

46.     The Oxford  products bearing the name, logo and trade dress described above have been shipped from Pennsylvania to many other states, including New Jersey, New York, California, and Illinois, just to name a few. Accordingly, the market and consumers throughout the United States associate Oxford's branding described above with the Oxford products.

### Oxford's Operations

47.     In 2013 and 2014, the Naviwalas regularly traveled from New Jersey to Bensalem, Pennsylvania to help run Oxford's operations. In September 2014, the Naviwalas moved their residence from New Jersey to Pennsylvania to be closer to Oxford, which operated out of Nidico's office. Between 2013 and 2016, the Naviwalas were present in the Oxford office on a day-to-day basis and they also worked every major trade show on behalf of Oxford.

48.     The Naviwalas were working full time and were involved in hiring office staff, and training office staff, and also involved in managerial and operational duties of the office.

49.     In 2013, the Naviwalas loaned an additional $224,000 to Oxford for inventory purchasing. This loan amount was deposited into Oxford's business checking account.

50.     Pursuant to the parties' agreement, Weave Hub purchased product on behalf of Oxford, and Oxford repaid Weave Hub using the funds in the business checking account.

51.     For fiscal year 2013, Oxford had $174,906 in sales, $33,675 in gross profit, and $4,836 in net profit. For fiscal year 2013, Oxford paid Nidico the 4% Infrastructure Fee, which

equaled $6,996.  For fiscal year 2013, Oxford paid Weave Hub the 3% Sourcing Fee, which equaled $10,775.

52.     In 2014, the Khannas requested that the Naviwalas loan more money to Oxford, as the initial $300,000 loan had been used to purchase inventory and was almost gone.  The Naviwalas were hesitant to loan more money to Oxford.  The Khannas personally guaranteed that if any of the loan was lost, Satish Khanna would pay back half of the loss of the loan amount.  The Naviwalas loaned an additional $203,000 to Oxford under the expectation that Oxford would repay the loan as soon as Oxford had enough capital to sustain itself.  This included $32,604 of Oxford's payables to Weave Hub which the Naviwalas agreed that Oxford could convert into long-term notes payable.

53.     In 2014, Nitin Khanna proposed that rather than Weave Hub purchase goods on behalf of Oxford and have Oxford reimburse Weave Hub, that Oxford buy and pay vendors directly.  Weave Hub would still invoice Oxford the 3% Sourcing Fee for all goods sourced out of Pakistan.

54.     The Naviwalas were reluctant to open their sourcing knowledge to the Khannas; however, after assurances from the Khannas that the 3% Sourcing Fee would never be disturbed and that Khannas would not source directly from these vendors, the Naviwalas agreed to this request.

55.     Also in 2014, the Khannas demanded that in addition to the 4% Infrastructure Fee paid to Nidico, that trade show and travel expenses be allocated between Oxford and Nidico by using a pro-rata formula.  The Khannas proposed that Oxford's and Nidico's sales would be used in determining this pro-rata formula.  The pro-rata formula would be applied to trade show and travel expenses and these expenses would be allocated to both Nidico and Oxford.

56.     For fiscal year 2014, Oxford had $1,133,680 in sales, $239,683 in gross profit, and $74,004 in net profit. By the end of 2014, the cumulative balance of Naviwalas' loans to Oxford was $459,604 and the cumulative balance of Khannas' loans to Oxford was $115,000.

57.     For fiscal year 2014, Oxford paid Nidico $77,846, which included 4% infrastructure fee of $45,299, trade show expense of $23,388 and travel expense of $9,159.

58.     For fiscal year 2014, Oxford paid Weave Hub the 3% Sourcing Fee equaling $18,793.

59.     In 2015, Nidico saw a decline in its sales. Nidico's overhead and fixed expenses, however, remained the same. Oxford, on the other hand, was seeing an increase in sales. Thus, the Khannas demanded that Oxford reimburse Nidico more than the 4% Infrastructure Fee. The Khannas demanded the 4% Infrastructure Fee be modified to a pro-rata sales formula.

60.     The Naviwalas disagreed with the Khannas' proposal. A meeting was held with Weave Hub's and Nidico's mutual accountant to discuss this issue. Nidico had a large infrastructure, which had already been in place before Oxford was formed. Oxford had agreed to pay Nidico the 4% Infrastructure Fee to use Nidico's existing office, warehouse, and marketing structure. Now, contrary to the parties' agreement, and because Nidico's sales were generally declining over time, Nidico and the Khannas sought additional reimbursement from Oxford. Contrary to the parties' original agreement, and for the express purpose of resolving the differences between the parties, the Naviwalas ultimately agreed, on an interim basis, to allocate all expenses based on a pro-rata sales formula as opposed to a fixed percentage fee as initially agreed upon. Nidico's expenses relating to its officers' salaries, entertainment, and automobile use were excluded from the pro-rata calculation.

61.     For fiscal year 2015, Oxford's sales were $2,208,495, its gross profit was $492,410, and its net profit was $202,820.

62.     By the end of 2015, the cumulative balance of the Naviwalas' loans to Oxford had increased to $500,000.

63.     By the end of 2015, the cumulative balance of the Khannas' loans to Oxford had increased to $225,000.

64.     For fiscal year 2015, Oxford paid Nidico $184,000 for operating and marketing infrastructure, which is approximately half of Nidico's operating expenses, excluding health insurance, salaries, and other expenses. This amounts to 8.3% of sales, a substantial increase from the agreed 4%.

65.     For fiscal year 2015, Oxford paid Weave Hub the 3% Sourcing Fee, equaling $45,510.

## Wind-Down of Oxford

66.     At the beginning of 2016, the Khannas demanded that the 3% Sourcing Fee Oxford paid to Weave Hub be reduced. The Naviwalas declined to amend the 3% Sourcing Fee. Satish Khanna informed the Naviwalas that their refusal to amend the 3% Sourcing Fee was a "deal breaker." Nitin Khanna, however, wanted to continue to work with the Naviwalas. Nitin Khanna was willing to continue to pay the 3% Sourcing Fee.

67.     Nitin Khanna suggested that Oxford pay off the Khannas' loan, and that the Naviwalas no longer use Nidico's office space and software, and that Oxford use Nidico's warehouse space as a third-party based on market rates. The Naviwalas and the Khannas agreed that the parties' respective loans would be paid back immediately; however, the Naviwalas' loan to Oxford was not repaid.

68.     Around this time, Satish Khanna demanded that Oxford pay him $50,000.  Satish Khanna attempted to justify this demand by creating invoices for additional interest on the money he loaned to Oxford and for other erroneous warehouse expenses.  These improper invoices were eventually reversed in the accounting system.  Satish Khanna, however, continued to create erroneous charges and invoices.  Nitin Khanna attempted to convince Satish Khanna to revoke the $50,000 demand, however, Satish refused.  Thereafter, Satish Khanna continued to enter erroneous invoices into Oxford's accounting system.

69.     At this point, the Naviwalas felt that there was no way to continue the partnership with the Khannas.  In August 2016, the parties agreed to wind-down and distribute the assets of Oxford, including the suspension of operations on October 31, 2016.

70.     The Naviwalas were gravely concerned that their loans to Oxford were not secure.  The Naviwalas had this concern due to Satish's erroneous $50,000 demand and the Khannas' refusal to repay the Naviwalas for an inadvertent overpayment by the Naviwalas to the Khannas of $25,000.

71.     As a result, the Naviwalas demanded their loan to Oxford be repaid.  In response, Satish Khanna demanded that his $225,000 loan to Oxford be repaid first and that he receive $50,000 in cash.   Satish Khanna promised that once the receivables were realized, the Naviwalas' loan would be paid back.  Oxford paid back the $225,000 loan to Satish Khanna in October 2016.  The Naviwalas' loan to Oxford was never repaid.

72.     During a meeting in September 2016, Ross Stores, Oxford's largest customer, was notified by the Khannas and Aisha Naviwala that after October 31, 2016, Oxford would be dissolving and that Nidico and Weave Hub would be marketing to Ross separately from that point forward.  For Oxford's remaining customers, the Khannas demanded that Weave Hub not

market itself until after October 31, 2016. After November 1, 2016, both Weave Hub and Nidico would be free to market to whomever they pleased, so long as they did not use Oxford's trade dress and trademarks.

73.    The Naviwalas requested that an email be sent to all customers advising that Oxford would be dissolved and to provide everyone's contact information. The Khannas refused and stated that after November 1, 2016, he would reach out to all buyers to inform them of Oxford's dissolution.

74.    On October 31, 2016, the Khannas deactivated the Naviwalas' Oxford email addresses.

75.    By November 1, 2016, the Naviwalas took physical possession of half of Oxford's inventory, which is valued at $200,000, and moved out of Nidico's office and warehouse space.

76.    In January 2017, Sameed Naviwala contacted Satish Khanna to discuss the accounting for October, November, and December 2016. The Khannas, however, refused to finish the accounting unless the Naviwalas signed a non-compete agreement. Further, Satish Khanna demanded $250,000 from the Naviwalas for the right to sell to Oxford's customers in return for completing the accounting. The Naviwalas declined Satish Khanna's demand.

77.    The parties contacted their mutual accountant in hopes that he could mediate a resolution. The Khannas advised that they have the Naviwalas' money in an account, and were willing to return the loan amount, as well as any other retained earnings, if the Naviwalas agreed to sign a non-compete or pay the Khannas $250,000 to sell to Oxford's top seven customers.

78.    Around that time, the Khannas began improperly depositing Oxford's accounts receivable checks into Nidico's bank account. To date, the Khannas have more than $750,000 in

cash owing to the Naviwalas, consisting of loans made by the Naviwalas to Oxford and retained earnings.

79.     Using a remote deposit device, the Khannas deposited Oxford checks into Nidico bank accounts.  The Khannas have fraudulently transferred this cash out of Oxford accounts and into Nidico and other accounts.  Further, the Khannas revoked the Naviwalas' HSBC key fob access.

80.     On information and belief, Nidico is using the Naviwalas' portion of Oxford assets as operating capital for Nidico.

81.     Nidico is now operated by the Khannas as an alter-ego of Oxford.

82.     The Khannas do not observe distinctions between the two entities, and comingle the two businesses' bank accounts, operating capital, and operations.  They have the same employees, and the Khannas do not observe corporate formalities in the operation of Nidico, nor in the Khannas' (now sole) control over Oxford's operations.

83.     The Naviwalas have also learned that Nidico is selling products using Oxford's trademark, logo, and trade dress in an attempt to pass its goods off as those of Oxford.  On information and belief, Nidico began labeling its products using Oxford's trademarks, logos, and trade dress while Oxford was still operating and using the trademarks, logos, and trade dress. For example, on the left below is an image of a Nidico product alongside an Oxford Label.

84.     On information and belief, Nidico began labeling its products using Oxford's trademarks, logos, and trade dress while Oxford was still operating and using the trademarks, logos, and trade dress.  For example, below is an image of a Nidico product on the left and an Oxford Label on the right.  On information and belief, the Nidico product pictured below was

labeled and shipped while Oxford was still in operation. The label of the Nidico product is *identical* to the Oxford label (see Exhibit A, 2016), right down to the snowflakes on the label.



85.     After Oxford began to wind down, at which point the parties agreed to suspend use of Oxford's branding, Nidico nevertheless continued to sell product using Oxford's branding. The packing of the Nidico products is indistinguishable from that of the Oxford products, and is a clear attempt by Nidico to pass its goods off as those of Oxford.

86.     For example, below are two images of side-by-side comparisons of the Nidico and Oxford Products.  In each image, the Nidico "Simply Home" product is shown on the left and the Oxford SIMPLY HOME product is shown on the right:

 

The Nidico products are labeled with Oxford's SIMPLY HOME trademark and logo, and Oxford's "CLASSIC·FINE·PURE" motto and logo as described above. The marks and logos are identical to those of Oxford. Additionally, the overall trade dress of the Nidico products is essentially the same as that of the Oxford products. In particular, the placement of the logo and motto is the same – i.e. logo top center, and motto below logo. The description and placement of the type of towel (e.g., "Kitchen Towel,") is the same--i.e., essentially centered in the label. The description and placement of the quantity (e.g., "set of two," "set of five") is the same—i.e., under the description of the towel. The description and placement of towel material/dimensions is also essentially the same, with the description of the material (e.g., "100%  Ringspun cotton") at the bottom, left justified, and the towel dimensions (e.g., 16 in x 19 in) at the bottom, right justified. Even the backgrounds and borders used by Nidico are part of Oxford's suite of package design options described above and shown in Exhibit A.

87.     Specifically, the first Nidico product shown above uses a black background and a white border having scalloped corners, which is *identical* to the Oxford product on the right. Likewise, the second Nidico product shown above has a striped background, which is *identical* to the artwork found in Exhibit A, 2014, an excerpt of which is shown below:



88.     Below is a side-by-side comparison of the Nidico "Kitchen Essentials" product on the left and the Oxford KITCHEN ESSENTIALS product on the right



89.     The Nidico products are labeled with Oxford's KITCHEN ESSENTIALS trademark and logo, as described above. The mark and logo are identical to those of Oxford. Additionally, as with Nidico "Simply Home" products described above, the overall trade dress of the Nidico "Kitchen Essentials" product is essentially the same as that of the Oxford products. In particular, the placement of the logo is the same – i.e. logo top center.   The description and placement of the type of towel (e.g., "Bar Mop Kitchen Towel,") is the same--i.e., essentially centered in the label.  The description and placement of the quantity (e.g., "set of five") is the same—i.e., under the description of the towel.   The description and placement of towel material/dimensions is also essentially the same, with the description of the material (e.g., "100% Ringspun cotton") at the bottom, left justified, and the towel dimensions (e.g., 16 in x 19 in) at the bottom, right justified.   Even the background and border used by Nidico is part of Oxford's suite of package design options described above and shown in Exhibit A.  Specifically, the Nidico product shown above has a background and border which is identical to the artwork found in Exhibit A, 2015, an excerpt of which is shown below:



90.     Even the back of the Nidico packaging is essentially the same as Oxford's.  In particular, the care instructions are identical to Oxford's in both description and display as described above.

91.     Because the marks, logo, motto, and packaging are essentially identical, and because the products are the same and are sold through the same market channels, a likelihood of confusion will arise among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods.  Potential customers will erroneously believe that the Nidico products are from Oxford.

92.     Nidico's actions in passing its products off as those of Oxford represents  a willful infringement of Oxford's trademarks, logos, mottos, and trade dress, and a willful violation of the Lanham Act.

### Derivative and Demand Allegations

93.     Plaintiffs bring this action derivatively in the right and for the benefit of Oxford to redress the Khannas' and Nidico's violations of the law.

94.     Plaintiffs are, and were at all relevant times, owners and members of Oxford.  The Naviwalas were owners and members of Oxford at the time of the alleged wrongdoing by the Khannas and Nidico.

95.     Plaintiffs will adequately and fairly represent the interests of Oxford in enforcing and prosecuting its rights.

96.     By letter dated May 10, 2017, Plaintiffs demanded that Oxford repay the Naviwalas' loans in the amount of $500,000. Plaintiffs further demanded that Oxford pay outstanding balances owed to Weave Hub and the Khannas. Additionally, Plaintiffs demanded that Nidico cease its use of Oxford's trade dress and marks. The Khannas have refused all demands.

## COUNT I
## APPOINTMENT OF A RECEIVER *PENDENTE LITE* UNDER 15 Pa. C.S. § 1984

97.     Plaintiffs incorporate the averments of all foregoing paragraphs by reference.

98.     Plaintiffs are shareholders in Oxford.

99.     The shareholders of Oxford have, since December 2016, been unable to agree on the distribution of assets in connection with the wind-down of Oxford.

100.    Plaintiffs request that the Court immediately appoint a liquidating receiver *pendent lite* under 15 Pa. C.S. § 1984 to collect the assets of Oxford and prevent their unlawful transfer or waste.

101.    Additionally, the Court should exercise its equitable powers to enjoin the transfer of any Oxford assets until such time as the receiver has been appointed.

WHEREFORE, Plaintiffs respectfully request that the Court appoint a receiver *pendente lite* for Oxford, enjoin further transfer of Oxford assets, and grant such further relief as the Court deems just and equitable.

## COUNT II
## APPOINTMENT OF A RECEIVER UNDER 15 Pa. C.S. § 1985

102.    Plaintiffs incorporate the averments of all foregoing paragraphs by reference.

103.    Plaintiffs are shareholders in Oxford.

104.    The shareholders of Oxford have, since December 2016, been unable to agree on the distribution of assets in connection with the wind-down of Oxford.

105.    Plaintiffs request that the Court appoint a liquidating receiver under 15 Pa. C.S. § 1985 to collect the assets of Oxford and effectuate a distribution.

106.    Additionally, the Court should exercise its equitable powers to enjoin the transfer of any Oxford assets until such time as the receiver has been appointed

WHEREFORE, Plaintiffs respectfully request that the Court appoint a receiver for Oxford, enjoin further transfer of Oxford assets, and grant such further relief as the Court deems just and equitable.

**COUNT III**
**BREACH OF CONTRACT**
**(Direct Against the Khannas)**

107.    Plaintiffs incorporate the averments of all foregoing paragraphs by reference.

108.    Defendants Satish Khanna and Nitin Khanna have breached the partnership agreement entered in with the Naviwalas.

109.    Plaintiffs have been, and continue to be damaged by Defendants the Khannas' breach of contract.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants in an amount to be determined at trial.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY**
**(Direct and Derivative Against the Khannas)**

110.    Plaintiffs incorporate the averments of all foregoing paragraphs by reference.

111.    As partners, the Khannas owe a fiduciary duty to Plaintiffs, and as a result, the Khannas owe Plaintiffs the highest degree of loyalty.

112.    As members of Oxford, the Khannas owe a fiduciary duty of good faith and loyalty to Oxford.

113.    The Khannas' acts of fraud, self-dealing, and conversion of Oxford's funds constitute a breach of the Khannas fiduciary duties owed to Oxford.

114.    The failure of the Khannas to distribute all assets of the partnership to Plaintiffs constitute a breach of the Khannas' duty owed to Plaintiffs.

115.    The Khannas' actions constitute a breach of fiduciary duties owed to Plaintiffs and Oxford.

116.    Plaintiffs and Oxford have been damaged as a result of these breaches of fiduciary duties.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants in an amount to be determined at trial.

**COUNT V**
**CONVERSION**
**(Direct and Derivative Against the Khannas and Nidico)**

117.    Plaintiffs incorporate the averments of all foregoing paragraphs by reference.

118.    Defendants have intentionally and unlawfully exercised, and continue to exercise, dominion over assets that should have been distributed to the Naviwalas within a reasonable time after October 31, 2016.

119.    Defendants' conduct constitute a conversion of Plaintiffs' and Oxford's property contrary to Pennsylvania law.

120.    Defendants' acts of conversion were committed willfully, knowingly, maliciously, and in conscious disregard of their legal obligations to Plaintiffs and Oxford.

121.    Defendants' conduct has caused and continues to cause injury to Plaintiffs and Oxford.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants in an amount to be determined at trial.

## COUNT VI
## UNJUST ENRICHMENT
**(Direct and Derivative Against the Khannas and Nidico)**

122.    Plaintiffs incorporate the averments of all foregoing paragraphs by reference.

123.    Defendants have retained the benefit of receiving all of the proceeds and good will as a result of the partnership entered into with the Naviwalas, but have refused, and continue to refuse, to reimburse Plaintiffs for their share of the partnership assets.

124.    Without compensation to Plaintiffs, Defendants have exploited, and continue to exploit, such assets in support of an ongoing business at the location of Oxford's business.

125.    As a result of Defendants' acts of fraud, self-dealing, and conversion of Oxford's funds, Defendants have been unjustly enriched at the expense and to the detriment of Plaintiffs and Oxford.

126.    Consequently, Nidico and the Khannas have been unjustifiably enriched and have caused Plaintiffs and Oxford to suffer monetary damages.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants in an amount to be determined at trial.

## COUNT VII
## FRAUDULENT TRANSFER
**(Direct and Derivative Against the Khannas and Nidico)**

127.    Plaintiffs incorporate the averments of all foregoing paragraphs by reference.

128.   At the time of its wind-down in October 2016, Oxford owed the Naviwalas in excess of $900,000.  Rather than satisfy that debt, Oxford, through the actions of the Khannas, fraudulently transferred all or part of that sum to Nidico's and/or the Khannas' private accounts.

129.   These transfers were undertaken with the intent to conceal the funds owed to the Naviwalas, to avoid paying Oxford's debts to the Naviwalas, and to hinder the Naviwalas' ability to collect the amounts owed.

130.   Oxford did not receive a reasonably equivalent exchange for the transfer to Nidico's and/or the Khannas' private accounts.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants in an amount to be determined at trial.

## COUNT VIII
## TRADEMARK INFRINGEMENT (15 U.S.C. § 1125(a))
### (Derivative Against the Khannas and Nidico)

131.   Plaintiffs incorporate the averments of all foregoing paragraphs by reference.

132.   Oxford is the owner of a common law trademark and logo for "SIMPLY HOME."

133.   Oxford is the owner of a common law trademark and logo for "KITCHEN ESSENTIALS."

134.   Oxford is the owner of a common law trademark and logo for "CLASSIC·FINE·PURE."

135.   Defendants have chosen to use the same marks to name their towel product, which is likely to cause confusion or mistake or to deceive the consumer as to the origin, sponsorship or approval of their product.

136.   Likewise, the logo Defendants are using to promote their products is essentially identical to the logos for the SIMPLY HOME and KITCHEN ESSENTIALS towels, which is

-26-

likely to cause confusion or mistake or to deceive the consumer as to the origin, sponsorship or approval of their product.

137.    Oxford has been irreparably damaged by Defendants' conduct in this regard, and continues to be so damaged.

WHEREFORE, Plaintiffs pray for the following relief with respect to this Count:

(a)    for judgment in its favor and against Defendants;

(b)    for preliminary and permanent injunctive relief enjoining and restraining Defendants from continuing to market and sell any product that competes with the SIMPLY HOME and KITCHEN ESSENTIALS towels that has SIMPLY HOME, KITCHEN ESSENTIALS, or CLASSIC·FINE·PURE anywhere in its name;

(c)    costs, expenses and attorney fees incurred herein; and

(d)    such other relief as the Court deems just and equitable.

**COUNT IX**
**TRADE DRESS INFRINGMENT (15 U.S.C. § 1125(a))**
**(Derivative Against the Khannas and Nidico)**

138.    Plaintiffs incorporate the averments of all foregoing paragraphs by reference.

139.    Oxford owns the distinctive trade dress associated with the Oxford  brand of towels.

140.    Defendants have chosen to use similar trade dress to package their towel product, which is likely to cause confusion or mistake or to deceive the consumer as to the origin, sponsorship or approval of their product.

141.    Oxford has been irreparably damaged by Defendants' conduct in this regard, and continues to be so damaged.

WHEREFORE, Plaintiffs pray for the following relief with respect to this Count:

(a)    for judgment in its favor and against Defendants;

(b)      for preliminary and permanent injunctive relief enjoining and restraining Defendants from continuing to market and sell any product that competes with the Oxford towels that has the trade dress of the Oxford towels;

(c)      costs, expenses and attorney fees incurred herein; and

(d)      such other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

DATED this 20th day of July, 2017.

SAUL EWING LLP

Joshua W. B. Richards/204315
Stephen J. Driscoll/71086
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-7777
jrichards@saul.com
sdriscoll@saul.com

*Attorneys for Plaintiffs*

## **VERIFICATION**

Pursuant to Federal Rule of Civil Procedure 23.1(a), I verify that the foregoing facts are true and correct to the best of my knowledge, information, and belief, upon due inquiry.

Dated: July 20, 2017

/s/ *Sameed Naviwala*
Sameed Naviwala